

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* ERMA LEE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 4:19-CV-00412-P |
| TARRANT COUNTY HOSPITAL DISTRICT d/b/a JPS HEALTH NETWORK, | ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendant. | ) ) | |

<u>RELATOR'S SECOND AMENDED COMPLAINT</u>

Erma Lee ("Relator") brings this action against Defendant Tarrant County Hospital District d/b/a JPS Health Network ("JPS Health" or "Defendant") on behalf of the United States of America through the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("False Claims Act" or "FCA"). Relator seeks to recover all available damages, penalties, and remedies against Defendant for Defendant's violations of the False Claims Act detailed herein.

<u>INTRODUCTION</u>

1.     This is an action under the False Claims Act to recover damages and civil penalties from JPS Health for knowingly submitting, or causing to be submitted, false claims to government health care programs, including, but not limited to, Medicare, TRICARE, VA health benefit programs, and the Texas Medicaid program; knowingly making or using false statements or records material to false or fraudulent claims paid by

the United States; knowingly concealing or improperly avoiding or decreasing an obligation to pay or transmit money or property to the United States; and illegally retaliating against Relator as a result of identifying false claims submitted by JPS Health and amounts owed to the United States that JPS Health failed to repay.

2.      Relator first began working for Defendant in 1996 as an executive assistant. She worked her way up in the organization, becoming Director of Compliance for JPS Health.  As Director of Compliance, Relator was a crucial employee within JPS Health because she and her team were tasked with identifying potential health care fraud and abuse concerns.

3.      Beginning in or around 2015, Relator oversaw a team conducting an internal audit related to JPS Health's submission of claims containing certain code modifiers that had been flagged by the United States Department of Health and Human Services (HHS) as frequently failing to meet Medicare program requirements.  The JPS Health Compliance Department's audit overseen by Relator identified shocking error rates implicating an enormous number of claims submitted to payors, including Medicare, TRICARE, VA health benefit programs, and the Texas Medicaid program.  For example, an audit into JPS Health's use of Modifier 25 found that 88% of Medicare claims using that modifier and 100% of Texas Medicaid claims using that modifier were erroneous.

4.      Relator brought her team's findings and concerns to the attention of JPS Health's executive management.  Defendant knew that refunds were owed to the United States.  JPS Health ignored the problem and failed to repay the amounts owed.  Then, in 2017, JPS Health fired Relator.

5.     Relator brings this action to ensure American taxpayers are repaid all amounts JPS Health owes to them.

## PARTIES

### Plaintiffs

6.     Relator Erma Lee is an individual citizen of the United States of America residing in Fort Worth, Texas.  She has direct, first-hand, and independent knowledge of conduct giving rise to this lawsuit.  Relator is a former employee of JPS Health.  During the regular course of her employment, Relator had access to information as part of her job duties and responsibilities that supports the claims brought herein.

7.      The United States of America is a Plaintiff and real party in interest as set forth in the False Claims Act.  Relator seeks recovery on behalf of the United States for amounts paid by the United States as a result of false claims submitted, or caused to be submitted, by Defendant, as well as all applicable penalties.

### Defendant

8.     Defendant Tarrant County Hospital District d/b/a JPS Health Network is a component unit of Tarrant County, Texas.  Defendant is a covered entity and health care provider that is located at 1500 South Main Street, Fort Worth, Texas 75051.  Defendant can be served at its headquarters at 1500 South Main Street, Fort Worth, Texas 75051 and/or through an authorized officer or agent.

## RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

9.     Defendant is vicariously liable for the actions and omissions of its executives, employees, and agents.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over these claims brought under the False Claims Act, 31 U.S.C. §§ 3279, *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732, 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

11.     This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because that section of the False Claims Act authorizes nationwide service of process, implicating the National Contacts Test for personal jurisdiction, and because Defendant operates and transacts business in the Northern District of Texas.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1395(a) because Defendant transacts business in this District and a substantial part of the events or omissions giving rise to this action occurred in this District.

13.     Relator is not aware of any public disclosures of the allegations and transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730.

14.     This action has been properly served on the United States as required by the False Claims Act.  *See* 31 U.S.C. § 3730(b)(2); Fed. R. Civ. P. 4(d)(4).

15.     Relator is the original source of the information forming the basis of this action because she possesses direct and independent knowledge of non-public information upon which the allegations herein are based.  *See* 31 U.S.C. § 3730(e)(4)(B).  Relator acquired non-public information during her employment that is independent from and materially adds to any publicly disclosed information relating to Defendant's violations of the False Claims Act described herein.

16.     Relator has complied with all conditions precedent to bringing this action.

## LEGAL FRAMEWORK

### A. The Medicare Program

17.     In 1965, Congress enacted The Health Insurance Program for the Aged and Disabled through Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq*., ("Medicare").   Medicare is a federal health care program providing benefits to persons who are over the age of 65 and some under that age who are blind or disabled.   Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), a federal agency under the Department of Health and Human Services (HHS).   Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

18.     The Medicare Program includes various "Parts," which refer to the type of service or item covered.   Medicare Part A, for instance, authorizes payment of federal funds for, among other things, medically necessary inpatient hospital care.   Medicare Part B covers, among other things, medically necessary outpatient care, physician services, and diagnostic laboratory services.

19.     Medicare reimburses only reasonable and necessary medical products and services furnished to Medicare beneficiaries and excludes from payment services that are not reasonable and necessary. 42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.115(k). Providers[1] must provide medical services to Medicare beneficiaries "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1).

20.     Medicare utilizes "Medicare Administrative Contractors," sometimes referred to as "fiscal intermediaries" or "carriers," to administer Medicare in accordance

---

[1] Relator uses the term "providers" herein to include all health care practitioners, providers, and suppliers, notwithstanding definitional differences between "providers" and "suppliers" in some regulations.

with rules developed by CMS.  These contractors are charged with and are responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

21.     CMS hires these contractors to review, approve, and pay Medicare claims received from health care providers.  Given that it is neither realistic nor feasible for CMS or its contractors to review all relevant medical documentation before paying each claim, payment is generally made under Medicare in reliance upon the provider's enrollment obligations as well as certifications on Medicare claim forms that services in question were "medically indicated and necessary for the health of the patient."  In other words, Medicare and other federal health care programs are "trust-based" systems.

22.     Medicare will only reimburse costs for medical services that are necessary for the prevention, diagnosis, or treatment of a specific illness or injury.

23.     Certification attestations on Medicare enrollment forms, claim submissions, and Medicare Cost Reports play an important role in ensuring the integrity of the Medicare Program.  *See* 42 C.F.R. § 413.24(f)(4)(iv).

24.     Medicare enters into agreements with providers to establish their eligibility to participate in Medicare.  Providers complete a Medicare Enrollment Application (often called a Form CMS-855A) whereby the providers must certify compliance with certain federal requirements.  Among other things, providers agree as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction comply with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute

and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*Id.* All providers participating in Medicare share these obligations.

25.     The Medicare Enrollment Application also summarizes the False Claims Act in a separate section explaining the penalties for falsifying information in the application to "gain or maintain enrollment in the Medicare program." *Id.* § 14.

26.     As further detailed below, Defendant unlawfully caused taxpayer funds to be paid from Medicare arising from improperly coded claims, and Defendant failed to repay CMS after learning about overpayments Defendant received.

**B.  Veterans Affairs Health Benefit Programs and TRICARE**

27.     The Department of Veterans Affairs (VA) administers health benefit programs and pays for certain medical services.  For instance, one of those programs is the Civil Health and Medical Program of the Department of Veterans Affairs, also known as "CHAMPVA," which provides health insurance coverage to dependents of veterans with disabilities or who are deceased.

28.     TRICARE is a separate health benefit program administered by the Department of Defense, which covers certain military service members, military retirees, and families of service members and retirees.

29.     As further detailed below, Defendant unlawfully caused taxpayer funds to be paid from TRICARE and VA health benefit programs arising from improperly coded claims, and Defendant failed to repay these government health care programs after learning about overpayments Defendant received.

**C.  Texas Medicaid Program**

7

30.     The Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, administered in the State of Texas as the Texas Medicaid Program ("Texas Medicaid"), is a health care benefit program jointly funded and administered by the State of Texas and the United States.   CMS administers Medicaid on the federal level.   Medicaid helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs.

31.     The United States funds, on average, fifty to seventy percent of each Texas Medicaid payment made to Medicaid providers.   This federal share is known as the Federal Medical Assistance Percentage (FMAP).

32.     As further detailed below, Defendant unlawfully caused taxpayer funds to be paid from Texas Medicaid arising from improperly coded claims, and Defendant failed to repay the United States after learning about overpayments Defendant received.

**D.  The False Claims Act**

33.     The False Claims Act imposes liability to the United States upon any individual who, or entity that, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," § 3729(a)(1)(B); or "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," § 3729(a)(1)(G).

34.     "Knowingly" is defined to include actual knowledge, reckless disregard, and deliberate ignorance. *Id.* § 3729(b)(1).  The False Claims Act does not require proof of specific intent to defraud in order to establish a violation.  *Id.*

35.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, 28 C.F.R. § 85.5, and 85 Fed Reg. 37004-37010 (June 19, 2020), the applicable per-false-claim penalty under the False Claims Act assessed after January 19, 2020 is a minimum of $11,665 up to a maximum of $23,331.

## DEFENDANT'S UNLAWFUL CONDUCT

### A.  Summary and Background

36.     This is a straightforward case that can be summarized in three steps: (1) Beginning in at least 2016, Defendant's own compliance personnel, overseen by Relator as Director of Compliance, alerted Defendant that Defendant owed significant amounts of money back to the United States and other payors as a result of improper claims Defendant had submitted; (2) Defendant ignored the severity of the problem and failed to repay the amounts owed; and (3) Defendant retaliated against Relator and fired her.

37.     JPS Health is "a $950 million, tax-supported health care system for Tarrant County in North Texas."[2]

38.     JPS Health provides services to federal program beneficiaries and Texas Medicaid beneficiaries.

---

[2] JPS Health Network, *LinkedIn Page*, https://www.linkedin.com/company/jps-health-network (last visited Aug. 21, 2020).

39.     Relator joined JPS Health in or around 1996 as an executive assistant.  In 2001, JPS Health promoted Relator, making her the Privacy and Security Program Manager.

40.     From 2004 through her termination in November 2017, Relator was the Director of Compliance and Privacy Officer at JPS Health.  In that role, Relator, among other things, liaised with leadership, reported potentially non-compliant activities, and implemented directives related to corporate compliance and privacy programs.

41.     Relator participated in or directed numerous compliance audits. Relator reported the findings of audits and reviews to Defendant's executive team, including JPS Health's Chief Executive Officer, Chief Operating Officer, and Chief Financial Officer.

**B.  Billing Compliance Audits Expose Substantial Overpayments to JPS Health.**

42.     JPS Health's Compliance Department suspected for years that Defendant had a problem with improperly utilizing certain modifiers appended to health care claims. Specifically, Relator grew concerned about JPS Health's overuse and improper application of Modifier 25 and Modifier 59 appended to Current Procedural Terminology ("CPT") codes.

43.     The Healthcare Common Procedure Coding System (HCPCS) is a collection of codes that represent procedures, supplies, products, and services that may be provided to Medicare beneficiaries and individuals enrolled in private health insurance programs.

44.     CPT codes utilize a numeric coding system maintained by the American Medical Association.  The CPT is a uniform coding system consisting of descriptive terms

and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals.

45.     Providers use these codes to report services rendered to patients and to become eligible for reimbursement.

46.     Modifier 25 and Modifier 59, which are described in further detail below, had previously been flagged by the HHS Office of Inspector General (HHS-OIG) as being frequently used in a way that did not meet Medicare requirements and resulted in overpayments.   For instance, HHS-OIG's 2005 audit regarding the use of Modifier 25 uncovered that 35% of claims allowed in 2002 using Modifier 25 were erroneous, resulting in approximately $538 million in improper payments.[3]   Similarly, a report published by HHS-OIG in 2005 found that 40% of code pairs billed in fiscal year 2003 using Modifier 59 did not meet Medicare requirements, resulting in approximately $59 million in improper payments.[4]

47.     In or around 2015, Relator, in her role as Director of Compliance, believed she could utilize an electronic medical records computer program referred to as "EPIC" to analyze whether Defendant was improperly utilizing Modifiers 25 and 59 and, if so, the scope of the problem.   Relator and her team also sought to assess why JPS Health had,

---

[3]     HHS-OIG, *Use of Modifier 25*, OEI-07-03-00470 (Nov. 2005), https://oig.hhs.gov/oei/reports/oei-07-03-00470.pdf.

[4] HHS-OIG, *Use of Modifier 59 to Bypass Medicare's National Correct Coding Initiative Edits*, OEI-03-02-00771 (Nov. 2005), https://oig.hhs.gov/oei/reports/oei-03-02-00771.pdf.

around that time, been denied more than $1.6 million in payments due to, among other things, the misapplication of modifiers in CPT billing codes.[5]

48.     Beginning in or around 2015, Relator's compliance team developed a 2016 Work Plan, which included audits of Modifiers 25, 59, and XU.  Around that time, the Compliance Department began two related audits:  (1) Modifier 25 Billing Compliance Audit and (2) Modifiers 59 and XU Billing Compliance Audit.  As described below, the team's findings were alarming, showing a 95% error rate for JPS Health's use of Modifier 25 and a 70% error rate for JPS Health's use of Modifiers 59 and XU.

(i)    **Modifier 25 Billing Compliance Audit**

49.     Providers generally cannot charge payors like Medicare for performing evaluation and management ("E/M") services on the same day as a procedure.  However, in limited circumstances in which a provider performs E/M services that are "significant, separately identifiable, and above and beyond the usual preoperative and postoperative care associated with the procedure" providers can append Modifier 25 to a claim, which increases the amount paid.[6]

50.     Many procedure codes account for the fact that a provider will evaluate a patient on the day of a procedure, so separately billing for an evaluation results in overbilling.   Abuse of Modifier 25 can occur when, for instance, a provider inappropriately tries to obtain separate payment for E/M services that are already "bundled" in the procedure code.

---

[5] In other words, payors that caught a small portion of Defendant's misuse of modifiers denied the claims, showing that the proper use of the modifiers is material to the payment of health care claims.

[6]   HHS-OIG, *Use of Modifier 25*, OEI-07-03-00470, at p. i (Nov. 2005), https://oig.hhs.gov/oei/reports/oei-07-03-00470.pdf.

51.    Relator's compliance audit team requested a report through EPIC related to JPS Health's use of Modifier 25.

52.    Relator's compliance team performed a review on a random sample of 450 accounts that utilized Modifier 25 during the following periods:  January through March 2014; January through March 2015; and January through February 2016.  The results showed errors in 427 of the accounts—a 95% error rate.  JPS Health's Compliance Department included these findings in a table in its report.  A copy of the Modifier 25 Billing Compliance Audit report dated April 15, 2016 is attached as **Exhibit A**.[7]

53.    The conclusions of the Modifier 25 Billing Compliance Audit showed that JPS Health had received significant overpayments arising from the improper use of Modifier 25.

54.    The Compliance Department included recommendations and a "Corrective Action Plan" in the Modifier 25 Billing Compliance Audit, which included education and training directives.  In addition, the audit report directed that Patient Financial Services should "[r]eview overpayments for potential repayment to appropriate payers."

55.    Relator and her team reached the conclusion that JPS Health had been overpaid and needed to reimburse payors like Medicare, TRICARE, VA health benefit programs, and Texas Medicaid.

(ii)    **Modifiers 59 and XU Billing Compliance Audit**

56.    Similar to the Modifier 25 context, a provider can append Modifier 59 to a claim in certain circumstances when distinct procedures or services are provided to a

---

[7] Relator's copy of the Modifier 25 Billing Compliance Audit report has markings made in pen or marker.  Relator does not recall who made these markings.

patient on the same day as another procedure or service.  However, abuse of Modifier 59 occurs when the procedures or services are not distinct and arise from a single patient encounter.  This form of double billing is sometimes referred to as "unbundling."

57.    Modifier XU is a more-specific subset of Modifier 59 that went into effect on or about January 1, 2015.  It is to be used only when there is an unusual, non-overlapping service that is distinct because it does not overlap the usual components of the main service.  Similar to Modifier 59, abuse of Modifier XU arises when, for instance, a provider attempts to separately bill for a service that is already "bundled" in a payment for another claim.

58.    As with Modifier 25, Relator's compliance audit team performed an audit of a random sample of 300 records utilizing Modifier 59 and a random sample of 200 records with Modifier XU appended.  Relator's compliance team used the same period as in the Modifier 25 Billing Compliance Audit:  January through March 2014; January through March 2015; and January through February 2016.

59.    The results showed errors in 348 of the 500 accounts reviewed—a 70% error rate.  JPS Health's Compliance Department included these findings in a table in its report.  A copy of the Modifiers 59 and XU Billing Compliance Audit report dated May 9, 2016 is attached as **Exhibit B**.[8]

60.    The conclusions of the Modifiers 59 and XU Billing Compliance Audit showed that JPS Health had received significant overpayments arising from the improper use of Modifiers 59 and XU.

---

[8] Relator's copy of the Modifiers 59 and XU Billing Compliance Audit report has markings made in pen or marker.  Relator does not recall who made these markings.

61.     The Compliance Department included recommendations and a "Corrective Action Plan" in the Modifiers 59 and XU Billing Compliance Audit, which included education and training directives.   In addition, the audit report directed that Patient Financial Services should "[r]eview overpayments for potential repayment to appropriate payers."

62.     Relator and her team reached the conclusion that JPS Health had been overpaid and needed to reimburse payors like Medicare, TRICARE, VA health benefit programs, and Texas Medicaid.

## C. Defendant Fails to Repay the Amounts Owed.

63.     The compliance audits note that their findings were discussed internally at JPS Health.   The Compliance Department noted that it would be conducting follow-up reviews to evaluate the Corrective Action Plans.

64.     Once the compliance audits were finalized in or around April and May 2016, they were provided to JPS Health executive team members and eventually presented to the internal Governance Committee and to the Board of Managers.

65.      The concerns raised by the internal billing audits were discussed in internal meetings.   For instance, the Meeting Minutes for the Joint Governance Committee Meeting and Board of Managers Meeting from June 23, 2016 reflect a discussion among Relator, Senior Vice President for Enterprise Risk Management and Chief Compliance Officer Ron Skillens, and Board Secretary Charles Webber.   A presentation appears to have been discussed at that meeting, which noted that "Coding and Billing Audits" were part of the Compliance Work Plan.   This entry included the following objective:   "Assess

15

accuracy of coding and billing practices per regulatory guidelines." Next to the objective, the presentation noted that the "Risk Rating" was "High" and highlighted that rating in a red box. The description also showed that the audits for Modifiers 25, 59, and XU were completed.

66.   According to the Meeting Minutes, many of JPS Health's executives were in attendance at the June 23, 2016 meeting, including the Chief Executive Officer, the Chief Operating Officer, and the Chief Financial Officer.

67.   According to the Meeting Minutes, Mr. Webber asked about Modifiers 25 and 59. Mr. Skillens explained, among other things, that the Compliance Department was working with other departments to "ascertain precise numbers," apparently recognizing that JPS Health may have overbilled payors.

68.   Despite the significant findings in the audits and knowledge that the compliance risk was "high," JPS Health failed to appropriately act to correct the billing problems or to repay the amounts owed. Multiple employees at JPS Health were surprised that JPS Health failed to take appropriate corrective actions, including reimbursing payors.

69.   Relator recalls that, even six months after the audits were published, JPS Health had failed to adequately implement the Corrective Action Plans or to take appropriate steps to correct the submission of improper claims on a system-wide basis. Although some departments took corrective measures, such as placing an alert in an electronic health record for a claim to be reviewed before submission, Relator did not see these changes implemented system-wide.

70.    Despite Relator asking about refunds and the issue coming up in subsequent discussions, JPS Health simply failed to repay known overpayments and failed to honestly calculate the extent of the overpayments.

**D. Defendant Retaliates against Relator.**

71.    The law forbids retaliation against an employee as a result of efforts to stop violations of the False Claims Act.  Yet, that is exactly what JPS Health did to Relator, who had been with the system for more than 20 years.

72.    Throughout 2016 and into 2017, Relator continued to follow-up on the compliance billing audits her team had performed for Modifiers 25, 59, and XU.  Relator grew concerned that JPS Health had not repaid the amounts owed, ignoring the law and specific requirements that known overpayments be returned within 60 days.  Relator's work environment grew more and more hostile.

73.    Relator met with members of JPS Health's senior management on or about October 23, 2017.  Relator was told that she was being terminated and that JPS Health was giving her two weeks to announce her departure.  Relator's understanding at that point was that her last day would be November 6, 2017, and she planned to clean out her office the weekend prior.

74.    Relator was told that she was not expected to attend any leadership functions, including the two that were scheduled during the following two weeks.  Relator believes JPS Health terminated her in this fashion as a result of her efforts to do the right thing:  bringing the compliance and billing issues to the attention of JPS Health's

executive team.  In the end, however, JPS Health ignored the compliance problems, the taxpayers did not get repaid, and Relator lost her job.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

**Violations of the False Claims Act:  False Claims for Payment**
**31 U.S.C. § 3729(a)(1)(A)**

75.     Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

76.     Through the acts and omissions alleged above, Defendant knowingly presented, or caused to be presented, false or fraudulent claims to the United States for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

77.     Defendant violated the False Claims Act by submitting, or causing to be submitted, claims for reimbursement from federal health care programs, including Medicare, TRICARE, VA health benefit programs, and Texas Medicaid, knowing that those claims were ineligible for the payments demanded.

78.     False claims submitted, or caused to be submitted, by Defendant included claims resulting from improperly coded charges.

79.     Each claim submitted as a result of the Defendant's illegal conduct represents a false claim.

80.     The United States, unaware of their falsity, paid and may continue to pay claims that would not be paid but for Defendant's unlawful conduct.

81.    Defendant's conduct described herein was knowing, as that term is used in the False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

82.    By reason of the false or fraudulent claims, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

## SECOND CLAIM FOR RELIEF

### Violations of the False Claims Act:  Use of False Statements
### 31 U.S.C. § 3729(a)(1)(B)

83.    Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

84.    Defendant knowingly used or caused to be made or used false records or statements that were material to false or fraudulent claims for payment submitted to federal health care programs.  Those false records or statements used or caused to be used by Defendant include false or improper claims.

85.    Defendant's conduct described herein was knowing, as that term is used in the False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

86.    The United States, unaware of the falsity of the records and statements made by, used, or caused to be used by Defendant, approved, paid, participated in, and may continue to approve, pay, or participate in, payments made by federal health care programs for claims that would otherwise not have been approved and paid.

87.     By reason of these false records or statements, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each false or fraudulent claim.

### THIRD CLAIM FOR RELIEF

**Violations of the False Claims Act:  Concealing, Avoiding, or Decreasing Obligation to Pay or Transmit Money or Property to the United States**
**31 U.S.C. § 3729(a)(1)(G)**

88.     Relator realleges and incorporates by reference each of the preceding paragraphs as if fully set forth in this claim for relief.

89.     Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.  Specifically, Defendant knew its Compliance Department had identified significant overbilling and overpayment concerns.  Nonetheless, Defendant decided to risk keeping money that belonged to and was owed to the United States.  Defendant failed to repay all amounts owed to the United States.

90.     Defendant's conduct described herein was knowing, as that term is used in the False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

91.     By reason of Defendant concealing, avoiding, and/or decreasing its obligation to pay or transmit money or property to the United States, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

<u>FOURTH CLAIM FOR RELIEF</u>

**Violations of the False Claims Act:  Concealing, Avoiding, or Decreasing Obligation to
Pay or Transmit Money or Property to the United States
U.S.C. § 3729(a)(1)(G);
60-day Rule:  42 U.S.C. § 1320a–7k(d)(1); 42 CFR § 401.305**

92.     Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

93.     During the relevant period, Defendant presented numerous claims for payment to the United States through government programs such as Medicare, TRICARE, VA health benefit programs, and Texas Medicaid.

94.     Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.  Specifically, Defendant knew its Compliance Department had identified significant overbilling and overpayment concerns.  Nonetheless, Defendant decided to risk keeping money that belonged to and was owed to the United States.  Defendant failed to repay all amounts owed to the United States within 60 days in violation of the Patient Protection and Affordable Care Act of 2010, 42 U.S.C. § 1320a–7k(d)(1), and 42 CFR § 401.305.

95.     Defendant's conduct described herein was knowing, as that term is used in the False Claims Act, and material, as that term is defined in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

96.     By reason of Defendant concealing, avoiding, and/or decreasing its obligation to pay or transmit money or property to the United States, the United States has sustained damages in a substantial amount to be determined at trial, and is entitled to treble damages plus a civil penalty for each violation.

Tarrant County Hospital District
Compliance Department
**Modifier 25 Billing Compliance Audit**
Compliance Review #20160415

Distribution:

Robert Earley, President and Chief Executive Officer
Bill Whitman, Executive Vice President and Chief Operating Officer
Sharon Clark, Executive Vice President, Chief Financial Officer
Frank Rosinia, MD, Executive Vice President, Chief Quality Officer
Dianna Prachyl, Senior Vice President, Chief Operating Officer Acclaim
Trudy Sanders, Vice President, Patient Care
Madhura Chandak, Executive Director Clinical Integration
Pat Alridge, Executive Director Women's Service
Kade Rutherford, Executive Director Revenue Cycle
Erika Jones, Director of Business Operations
Jillian Elliott, Director Health Centers for Women
Rhonda Johnson, Director Patient Accounting
Ronald Skillens, Senior Vice President Enterprise Risk Management, Chief Compliance Officer
District Compliance Committee
Board of Managers Governance Committee

---

## Table of Contents

|                                                         | Page |
|---------------------------------------------------------|------|
| Executive Summary                                       | 2    |
| Objective and Scope                                     | 2    |
| Background                                              | 3    |
| Rationale for Review (Regulatory Concerns and Guidance) | 3    |
| Findings and Corrective Action Plan Process             | 4    |
| Recommendations                                         | 7    |
| Methodology                                             | 7    |
| Corrective Action Plan                                  | 9    |

### FIFTH CLAIM FOR RELIEF

**Violations of the False Claims Act:  Retaliatory Action against Relator
31 U.S.C. §3730(h)**

97.    Relator repeats and re-alleges each allegation in each of the preceding paragraphs as if fully set forth herein.

98.    Defendant unlawfully retaliated against Relator for identifying and raising Defendant's obligations to repay money to the United States as detailed herein.  Despite more than 20 years of employment, Defendant singled out Relator for criticism and disciplinary action, harassed her, and ultimately fired her.

99.    Defendant's retaliatory conduct violated the False Claims Act.  Relator suffered damages as a result of Defendant's unlawful retaliation.

### PRAYER FOR RELIEF

**WHEREFORE,** Relator respectfully prays for judgment against Defendant as follows:

a.    On Claims for Relief One, Two, Three, and Four, treble damages and all applicable civil penalties in the maximum amount allowed by law;

b.    On Claim for Relief Five, two times the amount of back pay owed to Relator as a result of Defendant's retaliation;

c.    All attorney's fees and costs associated with prosecuting this civil action, as provided by law;

d.    Interest on all amounts owed to the United States and/or Relator; and

e.    For all other relief the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury trial for all claims and issues so triable.

August 28, 2020                              Respectfully submitted,

                                             **REESE MARKETOS LLP**

                                             By:  */s/ Joshua M. Russ*
                                                   Joshua M. Russ
                                                   Texas Bar No. 24074990
                                                   josh.russ@rm-firm.com
                                                   Joel W. Reese
                                                   Texas Bar No. 00788258
                                                   joel.reese@rm-firm.com
                                                   Brett S. Rosenthal
                                                   Texas Bar No. 24080096
                                                   brett.rosenthal@rm-firm.com
                                             750 N. Saint Paul St., Suite 600
                                             Dallas, Texas 75201-3201
                                             Telephone: (214) 382-9810
                                             Facsimile:  (214) 501-0731

                                             **RACHEL V. ROSE – ATTORNEY AT LAW,
                                             PLLC**

                                             By:  */s/ Rachel V. Rose*
                                                   Rachel Veronica Rose
                                                   Texas Bar No. 24074982
                                                   rvrose@rvrose.com
                                             P.O. Box 22718
                                             Houston, Texas 77227
                                             Telephone: (713) 907-7442
                                             Facsimile:  (855) 558-1745

                                             **WATERS & KRAUS, LLP**

                                             By:  */s/ Charles S. Siegel*
                                                   Charles S. Siegel, Esq.
                                                   Texas State Bar No. 18341875
                                                   csiegel@waterskraus.com
                                                   Taryn E. Ourso, Esq.
                                                   Texas State Bar No. 24107315
                                                   tourso@waterskraus.com
                                             3141 Hood Street, Suite 700
                                             Dallas, Texas 75219
                                             214-357-6244 (Telephone)
                                             214-357-7252 (Facsimile)

<u>**CERTIFICATE OF SERVICE**</u>

   The undersigned attorney certifies that the foregoing was served on counsel for the United States on August 28, 2020 via the Court's electronic filing system.  Because this action has not yet been served on Defendant and Defendant has not yet made an appearance, Defendant was not served.

         */s/ Joshua M. Russ*
         Joshua M. Russ

# Exhibit A

### Executive Summary

During a routine review of the Decision Resources Group Denials Dashboard Report provided by Patient Financial Services, the Compliance Department identified potentially aberrant billing patterns in the use of Modifier 25 by departments within the Tarrant County Hospital District (District). Modifier 25 is defined as significant, separately identifiable evaluation and management service by the same physician or other qualified health care professional on the same day of the procedure or other service.[i] Subsequently, the Compliance Department incorporated an audit of Modifier 25 into its 2016 Compliance Work Plan for further examination.

The analysis consisted of a review of a sample of claims data consisting of four hundred fifty (450) records across all payer classes, corresponding electronic medical record documentation, and the Medicare National Correct Coding Initiative (NCCI) coding tool. Through this compliance audit, we determined that Modifier 25 had been used inappropriately between January 2014 and February 2016 resulting in 427 of 450 claims billed in our sample that did not comply with coding guidelines (see **Tables 2 and 3** below).

Patterns of incorrect Modifier 25 usage included submissions:
- when documentation did not support a significant, separately identifiable procedure/service with the evaluation and management patient codes[ii].
- with incidental procedures not requiring the modifier (i.e. vaccine administration fee). [iii]
- with services other than evaluation and management codes.[iv]

In addition to the findings noted above, we also identified other incidental findings which included:
- level of care not supported by documentation
- duplicate billing
- inappropriate use of additional modifiers that are unnecessarily used on the same CPT code

The determinations noted resulted in discussion and issuance of the draft report to the appropriate parties, and a Corrective Action Plan (CAP), see page 9. The CAP included enhanced education on the proper use of Modifier 25 as well as processing repayments of overpayments or resubmission of claims, as appropriate. The CAP was completed by HIM, Patient Financial Services, Community Health and Women's Services management and accepted as sufficient. Additionally, the Compliance Department will conduct audits of the other modifiers identified as incidental findings and issue reports as appropriate. The Compliance Department will conduct a follow-up review of Modifier 25 ninety days after the execution of the CAP.

### Objective and Scope

The Modifier 25 audit was undertaken to partially assess $1.62 million in denials with a reason code labeled as follows: *The procedure code is inconsistent with the modifier used or a required modifier is missing* in a Decision Resources Group Denials Dashboard Report between October 2014 and October 2015. Note: denials in this report include multiple denials due to correction and resubmission of the same claim. This audit is a subset of an initiative to review all potential compliance-related modifier billing issues observed in the report.

The Modifier 25 audit was limited to documentation of only outpatient claims for all payers where Modifier 25 was billed during the periods of:
- January through March 2014,
- January through March 2015 and
- January through February 2016.

The audit was performed on a random sampling of four hundred fifty (450) total accounts during the timeframes stated above.  A total of one hundred fifty (150) accounts were reviewed for each period.  The sample size was chosen to align with an Office of Inspector General (OIG) Use of Modifier 25 Review[v]. Although there has not been a formal review by the OIG of Modifier 25 since 2005, the OIG continues to identify improper use of modifiers in other reviews performed in 2014, 2015, and 2016.  **Table 1** below represents the total number of patient accounts coded with Modifier 25 during the review period. The columns titled **Errors** and **Total Charges at Risk** in the table below provide a breakdown of the instances of incorrect application of Modifier 25 and total charges associated with those accounts by distinct payer class.

**Table 1: Accounts Coded for Modifier 25**

| Year | Payer | Number of Accounts | Total Charges | Errors | Total Charges at Risk |
|------|-------|--------------------|---------------|--------|-----------------------|
| 2014 | Medicaid | 746 | $1,704,414 | 8 | $2,488 |
|      | Medicare | 1447 | $2,653,545 | 38 | $9,211 |
|      | All Other Payers | 36492 | $36,492,629 | 101 | $127,942 |
| 2015 | Medicaid | 651 | $2,022,552 | 19 | $3,118 |
|      | Medicare | 2409 | $5,094,126 | 42 | $15,998 |
|      | All Other Payers | 25674 | $50,468,348 | 88 | $184,600 |
| 2016 | Medicaid | 480 | $1,638,333 | 1 | $  464 |
|      | Medicare | 1653 | $4,670,276 | 7 | $14,708 |
|      | All Other Payers | 21210 | $53,295,779 | 123 | $93,836 |

**Background**

The Compliance Department regularly reviews internal processes and reports as a means to identify potentially aberrant billing patterns that might be considered fraud or abuse. As such, during a routine review of the Decision Resources Group Denials Dashboard Report from October 2014 through October 2015 an issue was identified with claim denials for all payers for improper American Medical Association Current Procedural Terminology (CPT) modifier use.

The 2005 OIG Use of Modifier 25 audit identified 35% of claims reviewed using Modifier 25 did not meet Medicare program requirements resulting in $538 million of improper payments by Medicare and/or Medicare beneficiaries. The improper use of Modifier 25 continues to be a target for both The Centers for Medicare and Medicaid Services (CMS) and private insurer contractors.

**Rationale for Review - Regulatory Concerns and Guidance**

CMS requires the Modifier 25 CPT only be used:

- on claims for evaluation and management (E/M) services, and
- when these services are provided by the same physician or same qualified non physician practitioner (NPP) to the same patient on the same day as another procedure or other service.

CMS pays for an E/M service provided on the day of a procedure with a global fee period[vi] if the physician indicates that the service is for a significant, separately identifiable E/M service that is above and beyond the usual pre- and post-operative work of the procedure. Different diagnoses are not required for reporting the E/M service on the same date as the procedure or other service. Modifier 25 is added to the E/M code on the claim at the time of coding by the Health Information Management Department (HIM) coding staff through

3M software.   Rejections and denials for modifier issues are routed to HIM coding staff through EPIC work queues.

Both the medically necessary E/M service and the procedure must be appropriately and sufficiently documented by the physician or NPP in the medical record to support the claim even though documentation is not required for submission.  If the physician bills the service with the CPT modifier 25, CMS pays for the service in addition to the global fee without any requirement for documentation unless specific conditions are met.[vii]

The following instances of investigations and subsequent settlements with the Department of Justice (DOJ) demonstrate the OIG is actively collaborating with CMS to seek to reclaim money from egregious billing and fraud and abuse. On April 3, 2013, the United States Attorney's Office for the Middle District of Pennsylvania reported settlements made by two hospital systems totaling $1.48 million to resolve allegations that they submitted claims to Medicare for payment of improperly coded E/M services.  OIG investigations revealed the hospitals billed using Modifier 25 improperly. [viii]

**Findings and Corrective Action Plan Process**
A review of a sample of claims data consisting of four hundred fifty (450) records, corresponding electronic medical record documentation, and the (NCCI) coding tool resulted in a determination that HIM consistently uses Modifier 25 inappropriately.

Through this review the auditors determined inappropriate use of Modifier 25 between January 2014 and February 2016 resulting in **427 of 450** claims billed that did not comply with coding guidelines. **Table 2** below reflects error rate by payer class.

It should be noted that Patient Financial Services implemented an electronic medical record rule in March 2015 to route claims to a work queue to be reviewed by the outpatient discharge department where:
 1. a procedure visit type was scheduled and
 2. a procedure and an E/M visit are charged.
This was in response to a Texas Medicaid & Healthcare Partnership (TMHP) review of billing services beyond the scheduled/elective outpatient day surgery recovery period that resulted in a review of 28 accounts with a recoupment of $45,267.

The work queue was established for the discharge department to review the documentation for all procedure visit types that an E/M charge has been billed to ensure the appropriateness of the charges and that the modifier has been used appropriately.

Due to the findings noted, a Corrective Action Plan (CAP) must be completed within two weeks of the receipt of this report. The audit will be considered final when management responses are received and actions to be taken are agreed upon by the Compliance Department. Upon finalization, the audit report will be distributed to all parties listed in the Distribution list above and subsequently reported to the District Compliance Committee and the Board of Managers Governance Committee at the first meeting of each thereafter.

**Table 3** specifies a comparison of CMS guidelines, findings and overall impact.

Table 2: Error Rate by Payer

| Payer Name | # Reviewed | # Incorrect | % Error Rate |
|---|---|---|---|
| MEDICAID-TMHP | 19 | 19 | 100% |
| MEDICARE | 72 | 65 | 88% |
| AETNA | 55 | 52 | 95% |
| AMERIGROUP | 63 | 60 | 95% |
| BLUE CROSS/BLUE SHIELD | 17 | 17 | 100% |
| CARE IMPROVEMENT | 3 | 3 | 100% |
| CIGNA | 19 | 19 | 100% |
| COOKS | 43 | 43 | 100% |
| EXPANDED PHC GRANT | 2 | 2 | 100% |
| HEALTHSPRING | 4 | 4 | 100% |
| JPS SPONSORED PROGRAM | 49 | 48 | 98% |
| PENDING COVERAGE | 1 | 1 | 100% |
| PHC GRANT | 6 | 6 | 100% |
| SELF PAY | 45 | 41 | 91% |
| TARRANT COUNTY JAIL | 6 | 5 | 83% |
| TITLE V - CHILDRENS | 1 | 1 | 100% |
| TRICARE | 2 | 2 | 100% |
| UNITED HEALTHCARE | 22 | 21 | 95% |
| VETERANS ADMIN | 12 | 11 | 92% |
| WELLMED | 1 | 1 | 100% |
| WORKERS COMP | 8 | 8 | 100% |
| TOTALS | 450 | 427 | 95% |

**Table 3 – Guidelines and Findings** (Reference - Medicare Claims Processing Manual, Chapter 12, Section 30.6.6)

| Guideline | Finding | Instances | | | Impact |
|---|---|---|---|---|---|
| | | 2014 | 2015 | 2016 | |
| This modifier may be used to indicate that an E/M service was provided on the same day as another procedure that would normally bundle under the NCCI. In this situation, CPT Modifier 25 signifies that the E/M service was performed for a reason unrelated to the other procedure. | Modifier 25 is appended inappropriately to E/M services when bundled service was charged incorrectly. | 107 | 108 | 112 | Appending the modifier to bill separate service codes that should be billed under one comprehensive service code can result in inappropriate reimbursement. 83% error rate across all payers could result in need for repayment. |
| This modifier may be used to indicate that an evaluation and management (E/M) service or eye exam, which is performed on the same day as a minor surgery (000 or 010 global days) and which is performed by the surgeon, is significant and separately identifiable from the usual work associated with the surgery. | Modifier 25 is appended to E/M services that are not documented as significant and separately identifiable from the usual work associated with the surgery. | 41 | 37 | 4 | Appending the modifier to an E/M service that is not 1) documented and 2) found to be significant and separate from the standard surgical procedure results in the need for repayment. 13% error rate across all payers resulted in the need for repayment. |
| Medical record documentation must support the use of the modifier. The CPT 2016 description for this modifier specifies that a significant, separately identifiable E/M service is defined or substantiated by documentation that satisfies the relevant criteria for the respective E/M services to be reported. | Modifier 25 is appended to E/M services when no qualified service was performed on the same day. | | | 12 | Appending the modifier to an E/M service code when there is no qualified service may not impact reimbursement or result in denial but could be an indicator to a payer for further review. |
| Modifier 25 should be appended only to evaluation and management (E/M) service codes within the range of 92002-92014, 99201-99499, and with HCPCS codes G0101 and G0175. | Modifier 25 is appended to services other than E/M. | 2 | 2 | 2 | Appending the modifier to a CPT code other than an E/M code does not impact reimbursement or result in denial but could be an indicator to a payer for further review. |
| A different ICD-9-CM or ICD-10-CM code from the one submitted with the minor surgery is not required with the E/M code. The diagnosis for the E/M service and the other procedure may be the same or different. | No findings observed for these two billing requirements. | | | | |
| No supporting documentation is required with the claim when this modifier is submitted. | | | | | |

**Recommendations:**

The Health Information Management Department should:

1. Review the use of Modifier 25 and provide personnel training and education on its proper use to include a review of appropriate documentation before appending the modifier per CPT Manual and NCCI rules
2. Review documentation to ensure charges are appropriate and meet coding guidelines.
3. Review Modifier 25 usage weekly
4. Report Modifier 25 weekly review results on the Compliance Committee quarterly Coding Audit Review monitor
5. Ensure training and education is conducted to facilitate appropriate review of work queues for supporting documentation and proper charging and that unsupported charges are corrected or removed when necessary.

Patient Financial Services should:

1. Review overpayments for potential repayment to appropriate payers
2. Resubmit claims if appropriate

Community Health and Women's Services should:

1. Initiate a weekly charge review for all outpatient departments
2. Work with HIM to provide appropriate training and education on appropriate documentation charge practices.

**Methodology:**

Audit documentation was requested from the Electronic Medical Record Reporting analysts for all outpatient claims for all payers where Modifier 25 was billed during the first quarters of calendar years 2014 and 2015 and the months of January and February of 2016. A review was performed on a random sampling of four hundred fifty outpatient claims. A total of one hundred fifty accounts were reviewed for each of the first quarters of calendar years 2014 and 2015 and the months of January and February of 2016.

The auditors used the following approach to define and identify relevant controls:

**Relevant Regulatory Guidance and Information Sources**

*Statutes and Regulations:*

- *42 CFR § 424.5 (A)(6)*
- *Social Security Act §1833(e)*
- *Social Security Act §1862(a)(1)(A)*

*Other Authorities:*

- *Department of Health and Human Services  Office of Inspector General (OIG)   2015 Work Plan*
- *2005 OIG Report Use of Modifier 25 (OIE-07-03-00470)*
- *2013 OIG Report Wing Memorial Hospital Did Not Always Bill Correctly for Evaluation and Management Services Related to Diagnostic or Therapeutic Procedures and Supartz Injections (A-01-12-00519)*
- *2014 OIG Report Questionable Billing for Medicare Electrodiagnostic Tests (OEI-04-12-00420)*
- *2015 OIG Report Questionable Billing for Medicare Ophthalmology Services (OEI-04-12-00280)*
- *2016 OIG Report Medicare Compliance Review of Greenville Memorial Hospital (A-04-15-03082)*

*Internal Resources:*

- *Compliance review of Medicare claims for high-cost diagnostic radiology test for fiscal year 2015*
- *Electronic medical records reviewed for validation accuracy of report*

*Interviews*

- *Director, Patient Financial Services*
- *Supervisor Denials & Appeals, Patient Financial Services*
- *Inpatient Coding Auditor, Health Information Management*
- *Optimization Lead, 3M Health Information System*

Compliance Review #20160415
CMS Modifier 25 CORRECTIVE ACTION PLAN

| AUDIT FINDING | ACTION ITEM/ASSIGNED TO | ACTIONS TAKEN or PLANNED TO INCLUDE DATE ADDRESSED OR TARGET DATE |
|---|---|---|
| **Modifier 25 is routinely appended inappropriately to E/M services when no qualified service was performed on the same day.**<br><br>**Modifier 25 is appended to E/M services that are not documented as significant and separately identifiable from the usual work associated with the surgery.**<br>**Modifier 25 is appended to services other than E/M.** | Health Information Management (HIM) should review the use of Modifier 25 and provide personnel training and education on its proper use to include a review of appropriate documentation and charges before appending the modifier per American Medical Association Current Procedural Terminology (CPT) Manual and Medicare's National Correct Coding Initiative (NCCI) rules. HIM should review Modifier 25 usage weekly and report results in the quarterly Compliance Committee Coding Audit Review monitor.<br><br>Madhura Chandak, Executive Director Clinical Integration | 1. Health Information Management, Community Health, Women's Services and Compliance will meet to discuss education needs for documentation and charging issues. An education plan will be developed and implemented no later than August 16, 2016.<br>2. Health Information Management will provide education to coding staff on the appropriate use of Modifier 25 at an in-service scheduled in August 2016. A monthly review will be conducted of a sampling of accounts billed with Modifier 25 appended and education will be ongoing.<br>3. Health Information Management, Patient Accounting, EPIC and Compliance will meet to discuss 3M logic.<br><br>Comments from HIM leadership, Executive Director – Clinical Integration Quality Division –<br>1. JPS' workflow allow team members across the enterprise to assign the modifiers. An evaluation of this practice is much needed.<br>2. JPS, as an enterprise, does not have a team designated to edit the billing or account work queues to review billing. Without dedicated strategies around billing concerns, it will be hard to find a long term, sustainable solution. |

9 | Page

| AUDIT FINDING | ACTION ITEM/ASSIGNED TO | ACTIONS TAKEN or PLANNED TO INCLUDE DATE ADDRESSED OR TARGET DATE |
|---|---|---|
| Inappropriate billing patterns | Patient Financial Services should review overpayments for potential repayment to appropriate payers and resubmission of claims if appropriate.<br><br>Kade Rutherford, Executive Director, Patient Financial Services | 1. In accordance with the CMS 6037-F Final Rule Medicare Reporting and Returning of Self-Identified Overpayments, Patient Financial Services and Compliance will identify and issue necessary repayment by October 24, 2016. |
| Inappropriate documentation and charging issues | Community Health should initiate weekly charge review for all outpatient departments and work with HIM to provide training and education on appropriate documentation and charge practices.<br><br>Erika Jones, Director of Business Operations-CHC | 1. Community Health will meet with HIM, Compliance, and Women's Health to discuss and implement an education plan for appropriate documentation and charge capture, with an expected date of implementation no later than August 16, 2016.<br>2. Community Health will identify/develop a weekly charge reconciliation report with EMR clinical liaisons to be used to facilitate weekly charge review by nursing/management staff.<br>3. Community Health will develop guidelines for weekly charge reconciliation, train staff on charge reconciliation report usage and implement a weekly charge review process no later than October 1, 2016. |

| AUDIT FINDING | ACTION ITEM/ASSIGNED TO | ACTIONS TAKEN or PLANNED TO INCLUDE DATE ADDRESSED OR TARGET DATE |
|---|---|---|
| | Women's Services should initiate weekly charge review for all outpatient departments and work with HIM to provide training and education on appropriate documentation and charge practices. Jillian Elliott, Director Health Centers for Women | 1. Women's Services will meet with HIM, Compliance, and Community Health to discuss and implement an education plan for appropriate documentation and charge capture, with an expected date of implementation no later than August 16, 2016. 2. Women's Services will begin weekly charge reconciliation review by nursing/management staff. This process will be developed with an expected date of implementation no later than October 1, 2016. |

Note: The Compliance Department will work with HIM to develop education and training. A follow-up review will be conducted by the Compliance Department 90 days after the executed corrective action plan.

---

[i] The 2016 Common Procedure Terminology (CPT) Manual Appendix A defines modifier 25 as significant, separately identifiable evaluation and management service by the same physician or other qualified health care professional on the same day of the procedure or other service. It further offers the guidance that it may be necessary to indicate that on the day a procedure or service identified by a CPT code was performed, the patient's condition required a significant, separately identifiable E/M service above and beyond the other service provided or beyond the usual preoperative and postoperative care associated with the procedure that was performed. A significant, separately identifiable E/M service is defined or substantiated by documentation that satisfies the relevant criteria for the respective E/M service to be reported. The E/M service may be prompted by the symptom or condition for which the procedure and/or service was provided. As such, different diagnoses are not required for reporting of the E/M services on the same date. This circumstance may be reported by adding modifier 25 to the appropriate level of E/M service. This modifier is not used to report an E/M service that resulted in a decision to perform surgery.

[ii] Department of Health and Human Services (DHHS) Transmittal A-01-80, Modifier −25 should be appended only to evaluation and management (E/M) service codes within the range of 92002-92014, 99201-99499, and with HCPCS codes G0101 and G0175.

[iii] Medicare Claims Processing Manual, Chapter 12, Section 30.6.6

[iv] Medicare Claims Processing Manual, Chapter 12, Section 30.6.6

[v] Office of Inspector General (OIG) Use of Modifier 25 Review (OEI-07-03-00470)

[vi] The global surgical package, also called global surgery, includes all necessary services normally furnished by a surgeon before, during, and after a procedure. Medicare payment for the surgical procedure includes the preoperative, intra-operative, and post-operative services routinely performed by the surgeon or by members of the same group with the same specialty.

[vii] If the physician bills the service with the CPT modifier 25, CMS pays for the service in addition to the global fee without any requirement for documentation unless:

• inpatient dialysis services are billed (CPT codes 90935, 90945, 90947, and 93937), the physician must document that the service was unrelated to the dialysis and could not be performed during the dialysis procedure.

• preoperative critical care codes are being billed on the date of the procedure, the diagnosis must support that the service is unrelated to the performance of the procedure.

11 | P a g e

- CMS advises physicians that CPT code 99211 (office or other outpatient visit for the evaluation and management of an established patient, that may not require the presence of a physician or other qualified health care professional. Usually, the presenting problem(s) are minimal) cannot be paid if it is billed with a drug administration service such as a chemotherapy or non-chemotherapy drug infusion code which would include CPT code 36415 (collection of venous blood by venipuncture). This drug administration policy was expanded in the Physician Fee Schedule Final Rule, November 15, 2004 and the OPPS Conversion to also include a therapeutic or diagnostic injection code (effective January 1, 2005).

[viii] Department of Health and Human Services (DHHS) Transmittal A-01-80, Modifier –25 should be appended only to evaluation and management (E/M) service codes within the range of 92002-92014, 99201-99499, and with HCPCS codes G0101 and G0175. Department of Justice, US Attorney's Office Middle District of Pennsylvania; Martindale Legal Library

# Exhibit B

Tarrant County Hospital District
Compliance Department
**Modifiers 59 and XU Billing Compliance Audit**
Compliance Review #20160509

Distribution:
Robert Earley, President and Chief Executive Officer
Bill Whitman, Executive Vice President and Chief Operating Officer
Sharon Clark, Executive Vice President, Chief Financial Officer
Frank Rosinia, MD, Executive Vice President, Chief Quality Officer
Dianna Prachyl, Senior Vice President, Chief Operating Officer Acclaim
Trudy Sanders, Vice President, Patient Care
Madhura Chandak, Executive Director Clinical Integration
Pat Alridge, Executive Director Women's Services
Kade Rutherford, Executive Director Revenue Cycle
Erika Jones, Director of Business Operations
Jillian Elliott, Director Health Centers for Women
Rhonda Johnson, Director Patient Accounting
Ronald Skillens, Senior Vice President Enterprise Risk Management, Chief Compliance Officer
District Compliance Committee
Board of Managers Governance Committee

---

### Table of Contents

|  | Page |
|---|---|
| Executive Summary | 2 |
| Objective and Scope | 2 |
| Background | 3 |
| Rationale for Review (Regulatory Concerns) | 4 |
| Findings and Corrective Action Plan Process | 4 |
| Recommendations | 6 |
| Methodology | 6 |
| Corrective Action Plan | 8 |

**Executive Summary**

During a routine review of the Decision Resources Group Denials Dashboard Report provided by the Patient Financial Services, the Compliance Department identified potentially aberrant billing patterns in the use of Modifier 59 and XU by departments within the Tarrant County Hospital District (District). Modifier 59 is used to identify procedures/services, other than E/M services, that are not normally reported together, but are appropriate under the circumstances. Modifier XU is a subset of Modifier 59 that went into effect January 1, 2015 and is used to identify an unusual non-overlapping service that is distinct because it does not overlap the usual components of the main service.[ii] Subsequently, the Compliance Department incorporated an audit of Modifier 59 and XU into its 2016 Work Plan for further examination.

The analysis consisted of a review of a sample of claims data consisting of three hundred (300) records across all payer classes with Modifier 59 appended and two hundred (200) records across all payer classes with Modifier XU appended, corresponding electronic medical record documentation, and the Medicare National Correct Coding Initiative (NCCI) coding tool. Through this Compliance Department audit, we determined that:

1) Modifier 59 had been used inappropriately between January 2014 and February 2016 resulting in 224 of 300 claims billed that did not comply with coding guidelines
2) Modifier XU had been used inappropriately between January 2015 and February 2016 resulting in 124 of 200 claims billed in that did not comply with coding guidelines (see **Table 2** below).

Patterns of incorrect Modifier 59 and XU usage include:
- use of modifier on code pairs where documentation does not indicate a distinct and separate procedure from one another[iii]
- unbundled services[iv]
- appending Modifier 59 and XU on the same CPT code

The determination of findings noted resulted in discussion and issuance of the draft report to the appropriate parties and a Corrective Action Plan (CAP), (See page 8). The CAP included enhanced education on the proper use of Modifier 59 and XU as well as processing repayments of overpayments or resubmission of claims, as appropriate. The CAP was completed by HIM, Patient Financial Services, Community Health, and Women's Services management and accepted as sufficient. Additionally, the Compliance Department will conduct a follow-up review of Modifier 59 and XU ninety (90) days following the execution of the CAP.

**Objective and Scope**

The Modifier 59 and XU audit was undertaken to assess $1.62 million in denials with a reason code labeled as follows: *The procedure code is inconsistent with the modifier used or a required modifier is missing* in a Decision Resources Group Denials Dashboard Report between October 2014 and October 2015. Note: denials in this report include multiple denials due to correction and resubmission of the same claim.

The Modifier 59 and XU audit was limited to documentation of only outpatient claims for all payers where Modifier 59 or XU was billed as follows:

Modifier 59
- January through March 2014,
- January through March 2015
- January through February 2016

2 | P a g e

Modifier XU
- January through March 2015
- January through February 2016

The audit was performed on a random sampling of three hundred (300) accounts appending Modifier 59 and two hundred (200) accounts appending Modifier XU during the timeframes stated above. A total of one hundred (100) accounts were reviewed for the period of January through March 2014 and a total of two hundred (200) accounts were reviewed for each additional period. The sample size was chosen to align with the Office of Inspector General (OIG) Use of Modifier 59 To Bypass Medicare's National Correct Coding Initiative Edits Review.[v] Although there has not been a formal review of modifier 59 since 2005 the OIG continues to identify improper use of modifiers in other reviews performed in 2015 and 2016. **Table 1** below represents the total number of patient accounts coded with Modifier 59 or XU during the review period. The columns titled **Errors** and **Total Charges at Risk** in the table below provide a breakdown of the instances of incorrect application of Modifier 59 or XU and total charges associated with those accounts by distinct payer class.

**Table 1: Accounts Coded for Modifier 59 and XU**

| Year | Payer | Number of Accounts | Total Charges | Errors | Total Charges at Risk |
|------|-------|--------------------|---------------|--------|-----------------------|
| 2014 | Medicaid | 313 | $1,791,689 | 9 | $48,483 |
| | Medicare | 605 | $4,477,230 | 29 | $67,245 |
| | All Other Payers | 5585 | $34,351,232 | 69 | $423,916 |
| 2015 | Medicaid | 299 | $3,044,947 | 12 | $67,111 |
| | Medicare | 426 | $4,627,349 | 41 | $62,728 |
| | All Other Payers | 2764 | $28,265,916 | 72 | $690,086 |
| 2016 | Medicaid | 54 | $346,845 | 10 | $97,111 |
| | Medicare | 150 | $1,347,647 | 16 | $86,785 |
| | All Other Payers | 1161 | $9,699,289 | 90 | $480,708 |

**Background**

The Compliance Department regularly reviews internal processes and reports as a means to identify potentially aberrant billing patterns that might be considered fraud or abuse. As such, during a routine review of the Decision Resources Group Denials Dashboard Report from October 2014 through October 2015 an issue was identified with claim denials for all payers for improper American Medical Association Current Procedural Terminology (CPT) modifier use.

The OIG has identified the use of Modifier 59 as an area of focus for review. The 2005 OIG Use of Modifier 59 to Bypass Medicare's National Correct Coding Initiative Edits audit found that 40 percent of code pairs billed with modifier 59 did not meet program requirements, resulting in $59 million in improper payments. The improper use of modifier 59 continues to be a target for both The Centers for Medicare and Medicaid Service (CMS) and private insurer contractors.

3 | P a g e

### Rationale for Review - Regulatory Concerns and Guidance

Modifier 59 and other National Correct Coding Initiatives (NCCI) associated modifiers should NOT be used to bypass a PTP edit unless the proper criteria for use of the modifier are met. Documentation in the medical record must satisfy the criteria required by any NCCI-associated modifier that is used.

Effective January 1, 2015 CMS established four new Healthcare Common Procedure Coding System (HCPCS) modifiers to define subsets of the 59 modifier, a modifier used to define a "Distinct Procedural Service." Currently, providers can use the 59 modifier to indicate that a code represents a service that is separate and distinct from another service with which it would usually be considered to be bundled. Because it can be so broadly applied, some providers incorrectly consider it to be the "modifier to use to bypass National Correct Coding Initiative (NCCI)", it is the most widely used modifier. It is also associated with considerable abuse and high levels of manual audit activity, leading to reviews, appeals and even civil fraud and abuse cases. CMS is concerned by this pattern of abuse because such behavior siphons off funds that should be available to legitimate and compliant providers and additionally unnecessarily increases beneficiary costs.

The NCCI has Procedure to Procedure (PTP) edits to prevent unbundling and consequent overpayment to physicians and outpatient facilities. The underlying principle is that the second code defines a subset of the work of the first code so it would be inappropriate to report it separately. Separate reporting would trigger a separate payment and would constitute double billing.

However, it is recognized that in specific limited circumstances the duplicate payment could be sufficiently small or would not exist, so that separate payment would be indicated. Edits are defined by NCCI as optional and bypassable or as permanent and non-bypassable. Modifiers are used to bypass edits when they are set by NCCI as optional edits.

Use of modifier 59 does not require a different diagnosis for each HCPCS/CPT coded procedure. Conversely, different diagnoses are not adequate criteria for use of modifier 59. The HCPCS/CPT codes remain bundled unless the procedures are performed at different anatomic sites or separate patient encounters or meet one of the other three scenarios described above. Modifiers XE, XS, XP and XU were effective January 1, 2015. These modifiers were developed to provide greater reporting specificity in situations where modifier 59 was previously reported and may be utilized in lieu of modifier 59 whenever possible.

Modifiers may be appended to HCPCS/CPT codes only if the clinical circumstances justify the use of the modifier. A modifier should not be appended to a HCPCS/CPT code solely to bypass a PTP code pair edit if the clinical circumstances do not justify its use. If the Medicare Program imposes restrictions on the use of a modifier, the modifier may only be used to bypass a PTP code pair edit if the Medicare restrictions are fulfilled. Documentation must support the clinical circumstances to use the modifier.

### Findings and Corrective Action Plan Process

A review of a sample of claims data consisting of 1) five hundred (500) records and corresponding electronic medical record documentation, and 2) the NCCI coding tool resulted in a determination that HIM consistently uses Modifiers 59 and XU inappropriately.

Incorrect use of Modifier 59 and XU includes:
• use of modifier on code pairs where documentation does not indicate a distinct and separate procedure from one another
• unbundled services
• appending Modifier 59 and XU on the same CPT code
Through this review the auditors determined that **70 percent** of claims billed with Modifiers 59 and XU did not comply with coding guidelines.

Due to the findings noted, a Corrective Action Plan (CAP) must be completed within two weeks of the receipt of this report. The audit will be considered final when management responses are received and actions to be taken are agreed upon by the Compliance Department. Upon finalization, the audit report will be distributed to all parties listed in the Distribution above and subsequently reported to the District Compliance Committee and the Board of Managers Governance Committee at the first meeting of each thereafter.

Table 2: Error Rate of Reviewed Accounts by Payer

| Payer Name | Number Reviewed | Number Incorrect | Percent Error Rate |
|---|---|---|---|
| AARP | 6 | 6 | 100% |
| AETNA | 40 | 21 | 53% |
| AMERIGROUP | 19 | 10 | 53% |
| BLUE CROSS/BLUE SHIELD | 9 | 8 | 89% |
| CIGNA | 29 | 24 | 83% |
| COOKS | 6 | 5 | 83% |
| EXPANDED PHC GRANT | 2 | 1 | 50% |
| GENERIC-COMMERCIAL INSURANCE | 2 | 2 | 100% |
| HEALTHSPRING | 1 | 0 | 0% |
| HUMANA | 7 | 6 | 86% |
| JPS SPONSORED PROGRAM | 79 | 60 | 76% |
| LIABILITY INS-GENERIC | 1 | 1 | 100% |
| MEDICAID-TMHP | 57 | 31 | 54% |
| MEDICARE | 124 | 86 | 69% |
| PENDING COVERAGE | 3 | 3 | 100% |
| SECURE HORIZONS | 9 | 6 | 67% |
| SELF PAY | 56 | 42 | 75% |
| SUPERIOR HEALTH STAR | 1 | 1 | 100% |
| TARRANT COUNTY JAIL | 10 | 7 | 70% |
| TRICARE | 5 | 3 | 60% |
| UNITED HEALTHCARE | 20 | 15 | 75% |
| UNTHSC | 3 | 2 | 67% |
| VETERANS ADMIN | 6 | 4 | 67% |
| WELLCARE | 4 | 3 | 75% |
| YORK RISK SERVICES GROUP | 1 | 1 | 100% |
| TOTALS | 500 | 348 | 70% |

**Recommendations**

The Health Information Management Department should:

- review the use of Modifier 59 and the X{EPSU} Modifiers XE, XS, XP and XU and provide personnel training and education on proper use to include a review of appropriate documentation before appending the modifier per American Medical Association Current Procedural Terminology (CPT) Manual and Medicare's National Correct Coding Initiative (NCCI) rules
- review documentation to ensure charges are appropriate and meet coding guidelines
- review modifier usage weekly
- report modifier review results on the Compliance Committee quarterly Coding Audit Review monitor
- ensure training and education is conducted to facilitate appropriate review of work queues for supporting documentation and proper charging and that unsupported charges are corrected or removed when necessary.

Patient Financial Services should:

- review overpayments for potential repayment to appropriate payers
- resubmit claims if appropriate

Community Health and Women's Services should:

- initiate a weekly charge review for all outpatient departments
- work with HIM to provide appropriate training and education on appropriate documentation and charge practices

**Methodology:**

Audit documentation was requested from the Electronic Medical Record Reporting analyst for all outpatient claims for all payers where Modifier 59 was billed during the first quarters of calendar years 2014 and 2015 and the months of January and February of 2016 and where Modifier XU was billed during the first quarter of 2015 and the months of January and February of 2016. A review was performed on a random sampling of five hundred (500) outpatient claims.

The auditor used the following approach to define and identify relevant controls:

**Document Review**

*Statutes and Regulations:*

- *42 CFR § 424.5 (A)(6)*
- *Social Security Act §1833(e)*
- *Social Security Act §1862(a)(1)(A)*

*Other Authorities:*

- *Department of Health and Human Services Office of Inspector General (OIG) 2015 Work Plan*
- *Department of Health and Human Services (DHHS) Special Edition Article 1418*
- *CMS Manual System Transmittal 1422*
- *OIG Use of Modifier 59 to Bypass Medicare's NCCI Edits (OEI-03-02-0071)*
- *OIG Medicare Compliance Review of Greenville Memorial Hospital (A-04-15-03082)*
- *OIG Medicare Compliance Review of Huntsville Hospital for 2013 and 2014 (A-04-15-0017)*

*Internal Resources:*

- *Compliance review of Medicare claims for high-cost diagnostic radiology test for fiscal year 2015*
- *Electronic medical records reviewed for validation accuracy of report*

*Interviews*

6 | P a g e

- *Director, Patient Financial Services*
- *Inpatient Coding Auditor, Health Information Management*
- *Optimization Lead, 3M Health Information Systems*

Compliance Review #20160509
Modifiers 59 and XU Billing Compliance Audit
CORRECTIVE ACTION PLAN

| AUDIT FINDING | ACTION ITEM / ASSIGNED TO | ACTIONS TAKEN or PLANNED TO INCLUDE DATE ADDRESSED OR TARGET DATE |
|---|---|---|
| Modifiers 59 and XU are applied inappropriately to code pairs where documentation does not indicate a distinct and separate procedure from one another.<br><br>Modifiers 59 and XU are applied inappropriately to unbundle services. | Health Information Management (HIM) should review the use of Modifier 59 and the X{EPSU} Modifiers XE, XS, XP and XU and provide personnel training and education on its proper use to include a review of appropriate documentation before appending the modifier per American Medical Association Current Procedural Terminology (CPT) Manual and Medicare's National Correct Coding Initiative (NCCI) rules.  HIM should review Modifier 59 and subset Modifiers XE, XS, XP and XU usage weekly and report results in the quarterly Compliance Committee Coding Audit Review monitor.<br><br>Madhura Chandak, Executive Director Clinical Integration | 1. Health Information Management, Community Health, Women's Services and Compliance will meet to discuss education needs for documentation and charging issues.  An education plan will be developed and implemented no later than August 16, 2016.<br><br>2. Health Information Management will provide education to coding staff on the appropriate use of Modifier 59 and the X modifiers at an in-service scheduled for July 20, 2016.  A monthly review will be conducted of a sampling of accounts billed with Modifier 59 or X modifiers appended and education will be ongoing.<br><br>3. Health Information Management, Patient Accounting, EPIC and Compliance will meet to discuss 3M logic by August 20, 2016.<br><br>Comments from HIM leadership, Executive Director - Clinical Integration Quality Division –<br><br>1. The Compliance review should further clarify with precision that the financial impact is not entirely due to the modifier.  The financial opportunity with appropriate use of the modifier 59 and XU is a subset.  The true impact of the modifier use is yet to be determined.  To not elaborate further is misleading to the audiences. It can lead to unreasonable expectations and hamper our ability to deliver on this opportunity. |

| AUDIT FINDING | ACTION ITEM / ASSIGNED TO | ACTIONS TAKEN or PLANNED TO INCLUDE DATE ADDRESSED OR TARGET DATE |
|---|---|---|
| | | 2. At JPS, there are team members outside of HIM that apply modifier 59 and XU.  Some of these areas are Emergency department and Radiology.  Hence, please include these areas as the responsible parties.  HIM can certainly share the education and training and yet, the ownership for the outcomes should be shared.<br>3. Based on my analysis, please allow me to share the following two findings:<br>  a. JPS' workflow allow team members across the enterprise to assign the modifiers.  An evaluation of this practice is much needed.<br>  b. JPS as an enterprise does not have a team designated to edit the billing or account work queues to review billing.  Without dedicated strategies around billing concerns, it will be hard to find a long term, sustainable solution. |
| Inappropriate billing patterns. | Patient Financial Services should review overpayments for potential repayment to appropriate payers and resubmission of claims if appropriate.<br><br>Kade Rutherford, Executive Director, Patient Financial Services | 1. In accordance with the CMS 6037-F Final Rule Medicare Reporting and Returning of Self-Identified Overpayments, Patient Financial Services and Compliance will identify and issue necessary repayment by October 24, 2016. |
| Inappropriate documentation and charging issues. | Community Health should initiate weekly charge review for all outpatient departments and work with HIM to provide training and education on appropriate documentation and charge practices.<br><br>Erika Jones, Director of Business Operations-CHC | 1. Community Health will meet with HIM, Compliance, and Women's Health to discuss and implement an education plan for appropriate documentation and charge capture, with an expected date of implementation no later than August 16, 2016.<br><br>2. Community Health will identify/develop a weekly charge reconciliation report with EMR clinical liaisons to be used to facilitate weekly |

| AUDIT FINDING | ACTION ITEM / ASSIGNED TO | ACTIONS TAKEN or PLANNED TO INCLUDE DATE ADDRESSED OR TARGET DATE |
|---|---|---|
| | | charge review by nursing/management staff.<br><br>3. Community Health will develop guidelines for weekly charge reconciliation, train staff on charge reconciliation report usage and implement a weekly charge review process no later than October 1, 2016. |
| Inappropriate documentation and charging issues. | Women's Services should initiate weekly charge review for all outpatient departments and work with HIM to provide training and education on appropriate documentation and charge practices.<br><br>Jillian Elliott, Director Health Centers for Women | 1. Women's Services will meet with HIM, Compliance, and Community Health to discuss and implement an education plan for appropriate documentation and charge capture, with an expected date of implementation no later than August 16, 2016.<br><br>2. Women's Services will begin weekly charge reconciliation review by nursing/management staff. This process will be developed with an expected date of implementation no later than October 1, 2016. |

Note: The Compliance Department will work with HIM, Community Health and Women's Services to develop appropriate education and training. A follow-up review will be conducted by the Compliance Department 90 days following the execution of the CAP.

---

[i] Common Procedure Terminology (CPT) Manual defines modifier 59 as follows:

"Distinct Procedural Service: Under certain circumstances, it may be necessary to indicate that a procedure or service was distinct or independent from other non-E/M services performed on the same day. Modifier 59 is used to identify procedures/services, other than E/M services, that are not normally reported together, but are appropriate under the circumstances. Documentation must support a different session, different procedure or surgery, different site or organ system, separate incision/excision, separate lesion, or separate injury (or area of injury in extensive injuries) not ordinarily encountered or performed on the same day by the same individual. However, when another already established modifier is appropriate, it should be used rather than modifier 59. Only if no more descriptive modifier is available, and the use of modifier 59 best explains the circumstances, should modifier 59 be used.

[ii] CMS has defined four new HCPCS modifiers to selectively identify subsets of Distinct Procedural Services (59 modifier) as follows:

• XE Separate Encounter, A Service That Is Distinct Because It Occurred During A Separate Encounter
• XS Separate Structure, A Service That Is Distinct Because It Was Performed On A Separate Organ/Structure
• XP Separate Practitioner, A Service That Is Distinct Because It Was Performed By A Different Practitioner

- XU Unusual Non-Overlapping Service, The Use Of A Service That Is Distinct Because It Does Not Overlap Usual Components Of The Main Service

These modifiers, collectively referred to as -X{EPSU} modifiers, define specific subsets of the 59 modifier. CMS will not stop recognizing the 59 modifier but notes that CPT instructions state that the 59 modifier should not be used when a more descriptive modifier is available. CMS will continue to recognize the 59 modifier in many instances but may selectively require a more specific - X{EPSU} modifier for billing certain codes at high risk for incorrect billing.

[iii] Department of Health and Human Services (DHHS) Special Edition Article 1418
[iv] Department of Health and Human Services (DHHS) Special Edition Article 1418
[v] OIG Use of Modifier 59 to Bypass Medicare's NCCI Edits (OEI-03-02-0071)